Good morning. May it please the Court. My name is Peter O'Dan, and I'm appearing on behalf of the plaintiff appellant HotChalk, Inc. The reason I'm here is to urge the Court to reverse the District Court's ruling in this case, which, if it stands, means that any company that's in the business of providing professional services to its clients will essentially find that their D&O coverage is obliterated or eviscerated. But not their malpractice coverage. No. Well, no, actually. Well, that's a different policy, Your Honor. That's right. I'm interested, Mr. O'Dan, in the concession that HotChalk made that it rendered professional services at ER 220, footnote 5. You — if you concede that what HotChalk was doing was providing professional services, why is that not the end of the case? Well, it's not the end of the case, Your Honor. The term professional services in California is very broadly interpreted to mean any specialized skills or knowledge. And in this case, I don't think I can make an argument in good faith that these weren't professional services. But it needs to — the policy only excludes claims that arise out of the rendering of professional services. In this case, the act that created the potential liability for HotChalk was a business matter. It was a matter of compensation. This is much different. You were using an ineligible employee to render professional services. The employee was being paid compensation on a contingency basis for signing up students. What does that — the compensation doesn't change the fact of what services were being rendered, does it? No. The services were the services. But my position here and the position of my client is that the act of compensating that employee, it's one step removed from actually rendering services to a client. Rendering, it's a transitive verb, Your Honor. It implies that or means that somebody is providing something to someone. In this case, a compensation was not being provided. One step removed. Is that too far removed for the phrase arising under? I would say yes, Your Honor. I mean, isn't arising under the most flexible version of causation that we have, at least in California? Again, the California Court of Appeals seems to think that arising out of is construed very broadly. But, again, we can still find coverage for this claim even under that rule. Again, arising out of has to have a factual connection to the liability. But there is a factual connection. Your client is being sued for submitting false claims to the DOE. That's what they're being sued for. And submitting the false claims to the DOE, thereby defrauding the government. And one of the reasons they're fraudulent is because there's a false certification that you don't pay your employees the way you should. And then you say, yeah, I'm giving professional services when I provide the services I do to submit these claims and to get these students. And yet, the insurance doesn't apply? I mean, there's a couple different points I'd like to make, Judge Smith. Their services, they go outwards. And my client was accused of making false claims, which, of course, they denied. And the underlying action was settled after the Second Amendment complaint was dismissed. But I think we need to go beyond that specific instance and just look exactly at what the implications of the court's ruling would be, not just in this case, but for DNO policies in general. The district court essentially applied a but-for causation standard. It found that absent Hotshox Professional Services, there would have been no liability. And if you were to take that to its logical conclusion, any company that provides some type of professional services is going to find that anything that they're potentially found liable for arises out of those professional services, whether it's the outward-facing services or whether it's their internal management activity. Well, but it seems to me that if, in fact, the activity they undertake is undertaken in providing the professional services, that that's the very type of activity, if you will, which ought not get coverage under this policy. Well, the question is, where do you draw the line? Well, I draw the line especially when we're saying arising out of or arising from very widely, as did the district court. We got the words. We can't get around what California says about what the words say. And then I say, okay, you concede you provided services, including recruitment services to the universities, that this service was professional service, that these professional services, they're the ones that violated the law and injured the students and the government. I guess I'm trying to figure out how it doesn't rely or how the policy can apply. Let's think. I mean, again, if we were to take the court's ruling to its logical conclusion, almost nothing would be covered under the policy, and that can't be the right conclusion. Well, I think that, I mean, first of all, there's no question that you got a good settlement with your employee practice liability insurer. They looked at what was going on here, and they said, yeah, we better do something about this. Now, what happened is now you turn and you say, now I don't want this to be professional services. You're the one that conceded it was. Well, Your Honor, going back to your point about the EPL policy, there was a claim for retaliation, which I believe did trigger the duty of defense. So that wasn't triggered by the compensation practices. Again, this is a business decision, a management decision, any kind of management decision. These are the types of claims that are meant to be covered under the side C coverage, which is very broad coverage, provides coverage for any wrongful acts that the company itself is alleged to have entered into. And, again, the point of side C is to cover these very broad claims. Let me ask you a question. I looked at acceptance insurance versus SUI fee enterprises, and I looked at all of the cases that they list there in that case that suggest that they're arising out of or arising from or involved in those cases. I'm having a tough time understanding why this district court's broad interpretation of this language is any different from those cases. Now, I know you pick some out-of-circuit cases, but these are right in California, right under acceptance insurance. So I'm saying what part of those cases does not say how I should deal with this policy? Well, I submit to the court that none of these cases actually involve these more ancillary activities. Almost every case in which the professional services exclusion was applied involved outward-facing services that were provided to an insurance client, not inward-facing management decisions. So what you're saying is because we did all these things in management to provide the services, then, therefore, the services exclusion should not apply? Yep. The services exclusion is meant to cover claims arising out of the services provided to clients. If a client were to sue because it was not— This is the very thing you were doing. Well, this is compensation, Your Honor. I mean, it would be like saying— But your employees aren't suing you for improperly compensating them. Yeah, I mean, it's basically where— There's nothing wrong with your compensation plan, except that it violates your obligations in the kind of recruitment you were doing. Well, every company is obligated to follow the law. This is the case in Philadelphia Indemnity v. FMLS, where they were alleged to have violated the Real Estate Settlement Procedures Act, another federal regulation, because they were giving undisclosed kickbacks. In that case, those kickbacks weren't related to the services being provided, which was the real estate listing services, even though they did serve to essentially obscure the price competition, which was the purpose of RESPA. The court found that that did not implicate that company's professional services. Do I understand you to be saying that the only exclusion would be if the universities were to sue you for providing professional services that were in violation of the federal rules? That would certainly be one claim that would be excluded. But take a look at the arising under language. It isn't only arising under. It says, alleging based upon arising out of attributable to, directly or indirectly resulting from, in consequence of, or in any way involving the rendering or failing to render professional services. I can't imagine a broader clause. I agree it's a very broad clause, but it only applies to the outward-facing services that are being rendered. Rendered means given to someone. So unless the renderee sues you, then it's not excluded. It's a third party, provided that it was the services provided to that client or that applicant. How in the devil can we get past or in any way was involving the rendering? In any was involving. There's no question what you did was in any way involving. I think, Your Honor, we need to look back at the purpose of these policies. When looking at contracts, you need to look at what the intent of the party was for. In this case, Scottsdale sold a very broad side seat coverage to Hotshot, which expected some coverage under that side seat coverage grant. There's no doubt there's some coverage. In this case, they were expecting more than just coverage for driven actions as a private company. Well, it doesn't relate to security holders at all. No. So there is some coverage. Well, there's a very limited coverage, but I believe the parties intended to have more coverage than just that very narrow slipper. Otherwise, there was no point. Thank you. We've taken over your time. Thank you, Mr. Oldham. Thank you. Good morning, Your Honors. If it pleases the Court, Alexis Rogoski for the defendant appellee, Scottsdale Insurance Company. Hotshot, in its briefing, concentrated its arguments on the law and did not really address the underlying allegations in the key TAM complaint against it or seek to show why those allegations would fall outside of the exclusion. The key TAM complaint, as Your Honors has observed, is not an employment case. It's not concerned with Hotshot's internal compensation practices. It's brought by employees, but the real party in interest is the United States government. And in this case, the U.S. attorney in Arizona got involved after the second amended complaint was filed and initiated a settlement process that led to the resolution of this case and Hotshot paying $500,000 to the U.S. government. So this case is about Hotshot's enrollment services and about its certifications to the government that students are eligible for financial aid and a claim brought on behalf of the government, though not by the government, that those certifications were false. There's a sample agreement that was attached to the key TAM complaint. It's at page 112 of the record. It's captioned, Online Degree Granting Program Administrative Services Agreement. It's a services agreement. And the exhibit to that agreement describes Hotshot's enrollment services as well as the other services they provide, but those services include lead generation and recruiting activities, administrative efforts reasonably necessary to initiate the application and enrollment processes, aiding potential students in the process of transition. Mr. Rogolsky, I think that you're gilding the lily. There's an admission here that there were interprofessional services. As I see Mr. Rodin's point, he says, yes, there were professional services, but they were not causative. The services were not causative of the violation of the law. Your Honor, I would respond in this way. The agreement, and perhaps I did not need to address that point on what it provided with respect to services, the agreement provides that Hotshot will honor the incentive compensation band. It's a specific undertaking in Section 11 in addition to a general promise to comply with the law. And in this case, not only was Hotshot sued, but its enrollment, but its customer universities were sued. So this had an impact, you know, directly on Hotshot's customers and the universities that were the recipients of its enrollment services. And the KTAM complaint contains a number of allegations as to why those enrollment services were really nothing more than a boiler room sales environment or a boiler room. That it was a boiler room sales environment and that those services, because of the incentive compensation band, were improper. And, for example, it was alleged in the KTAM complaint that Hotshot would enroll students before or without receiving transcripts, that enrollment specialists approved applications regardless of the applicant's GPA, that enrollment specialists were instructed to create a false sense of urgency, that they were required to stay in contact with students and to try to confirm their enrollment even when students expressed some doubt about enrolling, that if a student rejected a financial aid plan, the enrollment specialist should continue to work with the student and try to persuade the student to enroll anyway, and that enrollment specialists were instructed to offer scholarships and to mislead students that this was an offer they had to act on immediately or it would be lost. So when we look at the type of allegations in the KTAM complaint, the undertaking Hotshot made to its university clients to comply with the incentive compensation band, we think this case does squarely involve the rendering of professional services. And we think the district court in its decision was very mindful of this. The district court went through the legislative history of the incentive compensation band and explained why the incentive compensation band protected both the government interest in protecting the assets of the U.S. Treasury as well as a public interest in that students shouldn't be enrolled in programs they weren't qualified for or undertake debt that they wouldn't be able to repay. So she viewed the complaint as well as the allegations concerning Hotshot's activities as squarely implicating what Mr. Rodan refers to as their outward-facing activities. And it's my understanding that you're really only suggesting that the only way the insurance company gets out of paying this is because of the professional services exclusion, correct? I mean, I didn't see any place in there where you contest that the claims are claims arising out of the error or omissions of the directors or officers. You didn't contest that, did you? We did not, Your Honor. So if it isn't the professional services exclusion, the company must pay? If it is not the professional services exclusion, there is coverage. There might be an issue as to whether the payment to the government as distinct from plaintiff's attorney's fees that were paid to realtors or their defense fees. There might be a worry about whether you should pay the $500,000 plus the $470,000, but you would have to pay the $500,000. Because the $470,000 was paid for the realtors' attorney's fees. That would be subject to coverage under the policy as well as the defense fees they incurred. Okay. Remember, Hot Truck, their EPL carrier did appoint defense counsel because of the retaliation claim, but because this really wasn't viewed as an employment claim by Hot Truck, they retained DLA Piper because it's a false claim act claim. It involves their services to the universities. And they incurred substantial fees in excess of what they were reimbursed by Lloyds. So those aspects of the claim, the attorney's fees for the relator and the defense fees may be subject to coverage, but there is an issue as to coverage for the $500,000 paid to the government, whether it's a fine or penalty or otherwise uninsurable. I understand. All right. We believe the district court, in relying on the Medill decision, which is a decision that arose under a breach of contract exclusion in the D&O policy, acted entirely consistently with court of appeals precedent. That case has been cited a number of times by different California court of appeals decisions that the case we submitted, the energy insurance case with our Rule 28J letter, which was a 2017 decision handed down after the briefing, reviewed the decisions that have both applied the professional services exclusion or found it on the particular allegations before the court it didn't apply. We believe the trial court's decision, Judge Wilkins' decision, is squarely within those precedents. And for that reason, we would request that Your Honors should affirm the district court. But we really owe no deference to Judge Wilkin, right? That is correct, Your Honor. It's still no review. The only thing we would accord to her is findings of fact. If she made any, which I don't know that she did. She did not make any findings of fact, Your Honor, but all right. All right. The judgment on the pleadings. Correct. It was a judgment on the pleadings. Thank you very much, Mr. Rogolsky. The case of Hot Chalk v. Scottsdale Insurance is submitted.
judges: Bea, N.R. Smith, Staton